The Charles R. Hedden Company sues to recover from Walter J. Dozier, its former treasurer, $65,219, which it charges he procured through fraud. The defendant answers that the sum was paid to him as the purchase price of his two hundred and seventy-five shares of the capital stock of the company.
There appears in the minutes of the company a resolution purporting to have been passed by the board of directors at a meeting on August 15th, 1922, that "should the treasurer at any future time and at his pleasure withdraw from the active management of the company's affairs, his stockholdings in the company shall be purchased by the Charles R. Hedden Company at the book value per share at the closing of business for the fiscal year ending December 31st, preceding his intention to withdraw, and date of resignation." It is charged that this resolution was never before the board for its consideration and is a false record, surreptitiously *Page 544 
incorporated in the minutes by Dozier; and it is further charged that a check of the company, dated January 14th, 1924, to the order of Dozier for $65,219, which he claims was given for his stock, was fraudulently obtained.
The business of the Hedden company is that of constructing engineers and builders of large structures, and its operations are extensive. It is a close corporation, with Charles R. Hedden, now seventy-three years of age, the master mind. He has been engaged in that line in Newark for upwards of fifty years, and erected many of the imposing buildings of that city and vicinity. Dozier, a much younger man, was for many years his bookkeeper and confidential secretary, until the company was formed in 1918 by Hedden and Dozier, and two others, who later sold their holdings to Hedden and Dozier. In February, 1922, James H. Toothe and Harold F. Fisher became stockholders. Toothe held twenty shares by gift from Hedden, his grandfather; Fisher, one hundred and fifty shares; Dozier, two hundred and seventy-five shares, and Hedden the balance, slightly more than a majority of the outstanding nine hundred shares, of the par value of $100. Hedden has always been the president and the practical man in charge of operations and Dozier was treasurer and the indoor man in charge of the finances and clerical force and affairs of the company, until he resigned January 15th, 1924. He was also secretary until he was succeeded by Toothe in February, 1922. Hedden, Dozier and Fisher constituted the board of directors from the time Fisher became a stockholder until Dozier quit the company in 1924. These three, according to the minutes, are supposed to have voted for the disputed resolution of August 15th, 1922.
Whatever question there may be as to the integrity of the August 15th, 1922, resolution, there can be no doubt that the check of January 14th, 1924, was not the result of negotiation and settlement based on that resolution. The resolution was never adverted to either by Hedden or Dozier, as the latter admits, from the date it bears until, as he says, at the conference of January 5th, 1924, he mentioned it to *Page 545 
Hedden, and that "he didn't say very much about it." In view of what he says happened at that meeting and the ensuing events, it is not believable that Dozier referred to it at that time. The relations between Hedden and Dozier became strained in the fall of 1923, and Dozier was constantly pressing Hedden to buy his stock, Hedden always refusing. Finally, at a pre-arranged conference on January 5th, 1924, Dozier says he offered to sell his or buy Hedden's shares at $200 per share; that Hedden refused the offer, but agreed that the company would take his (Dozier) shares at their book value as of December 31st, 1923, and directed him to prepare a statement of the financial standing of the company, which, he says, he forthwith proceeded to do; that on January 11th he showed Hedden his work sheets and told him that the book value of the stock would be, approximately, between $225 and $240 per share, and that he again expressed himself as willing to sell for $200 per share, as he had offered to do on January 5th, but that Hedden told him to go ahead and settle on the basis of the book value, which later, Dozier says, he determined to be $237.16 per share, by including in the assets items amounting to $134,279, anticipated profits on the incompleted contracts, which, on completion, according to a later accounting, were $57,061.02, and an item for good-will of the business of $52,354.16, which in the treasurer's annual statement was set down at one dollar. Upon completing the statement on January 14th, Dozier, according to his own admission, without again consulting Hedden or advising him of the result, drew the company's check for $65,219, and the next morning put it in an envelope with seventy-five other checks to be signed by Hedden, and placed the envelope on his desk. Hedden arrived later, signed them and handed them back to Dozier, who quickly drove to the Montclair bank, had his check certified and deposited it to his credit. He was late getting back to the annual meeting of the company held that afternoon. At the meeting he submitted the financial statement of the company showing assets, $490.166.51; liabilities, *Page 546 
$329,066.99 (not including the outstanding capital stock, $90,000), and net worth, $161,099.52, which was approved, subject to audit. Thereupon, Dozier submitted this resolution:
"Resolved, That Charles R. Hedden Company purchase shares of stock of Charles R. Hedden Company now standing in the name of Walter J. Dozier on the books of the said company at the book value thereof as shown on the treasurer's report submitted to this meeting and accepted and approved."
The resolution was rejected by a two to two vote, Dozier and Fisher voting for and Hedden and Toothe against. Dozier thereupon resigned as vice-president and treasurer and the next day turned his books over to Toothe, his successor, and also tendered him his certificate of stock, which he refused to accept. On the following day the bookkeeper discovered the entry of the check of $65,219 on the stub of the check book and reported it to Hedden. The reaction was confusion and consternation. The resolution of August 15th, 1922, was also found, and immediately a bill was prepared, filed on January 31st, in the name of Toothe on behalf of the company. Toothe v. Dozier, 96 N.J. Eq. 46; reversed,Ibid. 601. Upon the dismissal of that suit, as improperly brought by a stockholder, this bill was filed by the company.
There is not much mystery as to how Dozier got the check. He was in charge of the financial affairs of the company, was implicitly trusted, and he was all prepared. A few days before he deposited a check for $82,000 in the Montclair bank, which, on account of its size, ordinarily would have gone to the Fidelity-Union in Newark, and he gave directions that it be not drawn against. Of the seventy-six checks made out by his secretary, Miss Jackson, on the morning of January 14th, 1924, all but the one to Dozier had the amount filled in, transversely, in heavy red type, seemingly by a check-protecting device. Dozier filled in his own in the same red type the next morning, slid it into the envelope with the rest, laid the envelope on Hedden's desk and took a gambler's chance that it would be signed as routine, and he *Page 547 
was not disappointed. To Hedden they were simply a batch of business checks — and they were, all but one — and, unsuspectingly, he signed them on the dotted line without inspection, as he had done thousands of times before, exactly as Dozier expected he would. It was not a clever trick, just a vulgar cheat, a constructive forgery, perfidious and despicable. Dozier's fanciful story that he had offered his stock at $200 per share, and that Hedden insisted upon paying him the book value approximated to him at between $225 and $240 per share, and that he assumed that Hedden signed the check without comment in consequence of that arrangement, and without curiosity or inquiry as to how the obviously excessive sum total was reached, is only further testimony of his cunning. There was nothing in the activity over the books, or even if Dozier showed Hedden the work sheets or told him the approximate value of the shares to attract Hedden's attention or to arouse his suspicion, for it was the time for the annual statement which Dozier had been getting out for years. If the deal had been as amicably arranged as Dozier professes it was, why did he plant the check among others of ordinary affairs, and to which it bore no relation? Why was there no allusion to this check, given in settlement of this extraordinary transaction and that brought to a close a lifetime affiliation, either before or after it was signed, and why did Dozier rush to the bank to have it certified? And why the resolution that the company buy the stock at the book value as shown by the treasurer's report, when he had already pocketed the price at his own figures? And again, why, when his resolution was turned down, did he not retort that the stock had already been bought and paid for? The fraud is so palpable and glaring, on his own word, that it hardly need be stated that Hedden denies making any arrangement with Dozier on January 5th or at any other time to buy his stock, and it is not believable that he, having consistently refused to be a purchaser, suddenly shifted the sale to the company, of which he was the majority stockholder, and at a price of from $225 to $240 per share when the shares had been offered at $200. *Page 548 
The indictment against the resolution of August 15th, 1922, is of secondary interest.
The minute book is of the loose-leaf type, and the minutes of meetings from the election of Toothe as secretary, February 14th, 1922, to the last entry, January 16th, 1925, twelve in all, appear to have been regularly entered, and to each is appended a formal certificate signed by Hedden as president and Toothe as secretary that they were present at the meeting, and that they "have read the foregoing minutes of said meeting, and the same are in all respects a full, true and accurate record of the acts and things done thereat." Moreover, each page bears the impress of the corporation seal and each impression bears Toothe's initials. Dozier and Fisher affirmed that it was duly passed, after discussion, while Hedden and Toothe deny and say that there were no meetings held after Toothe was elected secretary until the annual meeting the following January (1923). Fisher denied having any recollection of it at first when Hedden discovered it, but on the witness-stand professed to have dissembled because he was in sympathy with Dozier. The minutes, as a whole, appear regular on the face of the record, and Hedden and Toothe, because of their certifications, would, ordinarily, be estopped from challenging them, and particularly so in view of the allegations in the bill of Toothe v. Dozier, supra, that the board of directors had adopted the resolution, and a similar allegation in the complaint in a civil action in the supreme court brought by the company against Dozier, Fisher and others for conspiracy to ruin the company's business, and a sworn statement to the same effect in an affidavit made by Toothe as a basis for criminal prosecution against Dozier. Yet, in the face of this impressive evidence, it is impossible to escape the feeling that the fraud had its inception in the disputed resolution. It is admitted by Dozier that up until the very day of the resolution Hedden refused to agree to an option to buy Dozier's stock or to sell his to Dozier upon the death of either, and Hedden says that the day following the date of the resolution, and he has an entry of it in his diary. Dozier again pressed him to sign *Page 549 
a form of agreement which he had previously submitted. It is singular that Hedden should refuse to buy at Dozier's death, and still, according to the resolution, agree to take at Dozier's pleasure. The minutes were prepared under Dozier's direction after Toothe was elected secretary of the company until the fall of 1923. His secretary would place them on Hedden's desk for signature. Hedden in his blind confidence signed them without much attention, and Toothe, inexperienced, followed suit to his grandfather's signature. It is not strange that the disputed resolution, which is one of many of the alleged meetings, covering three typewritten pages, should have escaped notice. It is in evidence that many of the minutes of meetings were prepared in group and handed to Hedden in batches, and it is evident that some of them were manufactured, as, for instance, the noting of Toothe's presence at the meeting of February 14th, 1922, when he was away on his honeymoon; Dozier's record of the meeting of September 19th, 1922, when he (Dozier) was away, and the recital in the minutes of the meeting of October "that the reading of the minutes of the regular meeting of the board of directors held on the 12th day of August, 1922, be ratified, approved and confirmed," which appears as the first entry, when, according to Dozier, the reading was had in connection with another subject before the meeting (Kelly Tire Company). These discrepancies adverted to go to prove Dozier's complete domination over the internal management. The things that are inexplicable and utterly discredit the minute of the disputed resolution are the facts that Dozier at no time for nearly a year and a half after the entry alluded to it, and that after its date, and especially in the fall of 1923, Dozier constantly importuned Hedden to buy his stock, and at the January 5th conference, and again at the January 11th interview, when, according to his story, the book value approximated between $225 and $240 per share, he offered to sell for $200. Why, if he had the promise of the company by resolution, honestly enacted, to take his shares at any time he felt like quitting, and if he were not conscious that it would stand daylight, did he *Page 550 
pursue and urge Hedden to take them off his hands? It is not difficult to believe that one wicked enough to stoop to the mean deception of which Dozier stands convicted upon his own attenuated recital of the manner in which he raided the treasury of the company, would lay his plans far enough in advance to have, as Fisher, his friend, naively wrote to Toothe's father, "a card up his sleeve" for an emergency.
Whatever may be the secret behind the resolution, or the solution of the manner in which it crept into the minutes, there is no question in my mind that Hedden was not aware of its existence until after his disillusionment of faith in Dozier in January of 1924. The allegation in the suits and the averment in the affidavit to which reference has been made ought not to be held against him. They were matters of pleading dictated by counsel, who assumes responsibility of failure to accurately state the facts by prefixing "it appears by the minutes of the company," c.
The fraud has been so clearly established that little need be said of the inefficacy of the resolution as a binding obligation, assuming that it was adopted. There was no consideration. It was not the unanimous act of the stockholders. Toothe did not assent to it, and its consummation would have impaired the capital of the company. The statute forbids the payment of any part of its capital stock to a stockholder. Comp. Stat. p. 1617; Siegman v.Electric Vehicle Co., 72 N.J. Eq. 403. Of course, Hedden's alleged promise of January 5th could not bind Toothe or the company.
Dozier will be decreed to pay back the money he unlawfully abstracted, with interest and costs. *Page 551